UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JAMES H. BESS, JR.,                                  16-cr-156
                                                     DECISION & ORDER
            Defendant.

On October 4, 2018, the defendant, James H. Bess, Jr., pleaded guilty to one

count of possessing with intent to distribute 5 grams or more of methamphetamine, in

violation of 21 U.S.C. § 841(a)(1).  *See* Docket Items 66-68, 71.  On May 10, 2019, this

Court sentenced Bess to a term of imprisonment of 84 months to be followed by five

years of supervised release.  *See* Docket Items 85-86.  Under 21 U.S.C. §

841(b)(1(B)(viii), the mandatory minimum term of imprisonment for the charge to which

Bess pleaded guilty is 60 months (5 years).  Bess has been incarcerated, most recently

under the authority of the Federal Bureau of Prisons ("BOP") at FCI Butner Low

("Butner"), for approximately 41 months and, crediting "good time," has served roughly

60% of his sentence.  *See* Docket Item 90 at 3.  His anticipated release date is October

20, 2022.  *Id.*

On April 13, 2020, Bess brought a motion for compassionate release under 18

U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018 ("First Step Act"),

Pub. L. No. 115-391, 132 Stat. 5194.  *See* Docket Item 90.  He argued that his

continued confinement in the wake of the COVID-19 pandemic and in light of his

multiple medical vulnerabilities poses a serious threat to his health and safety.  The

government opposed Bess's motion on April 20, 2020, arguing only that the motion should be denied because Bess has failed to exhaust administrative remedies. Docket Item 92.

This Court heard argument from both parties on April 21, 2020, and granted Bess's motion in a short memorandum, ordering that he immediately be released to home incarceration. *See* Docket Item 95. The Court now writes to explain its decision.

## DISCUSSION

"[A] court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Ogarro*, 2020 WL 1876300, at *2 (S.D.N.Y. Apr. 14, 2020) (Sullivan, *J.*) (quoting *United States v. Roberts*, 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020)). Section 3582(c)(1)(A) provides one such statutory exception, often referred to as "compassionate release." Under 18 U.S.C. § 3582(c)(1)(A)(i),

> [a sentencing] court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . if it finds that extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* The relevant policy statement, Guidelines section 1B1.13, in turn provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A),[1] the court may reduce a term of imprisonment (and may

---

[1] Until passage of the First Step Act, only the BOP could bring a motion for compassionate release. Section 1B1.13 consequently "is at least partly anachronistic because it has not yet been updated to reflect the new procedural innovations of the

impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1)      (A) Extraordinary and compelling reasons warrant the reduction; or

(B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) The reduction is consistent with this policy statement.

*Id.*  "The defendant has the burden to show he is entitled to a sentence reduction."

*United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

Accordingly, to obtain relief under section 3582(c)(1)(A)(i), Bess must show that

(1) he has met the exhaustion requirement, (2) "extraordinary and compelling reasons"

warrant a reduction of his sentence, (3) he is not a danger to others or the community,

and (4) a reduction is consistent with the factors set forth in section 3553(a).

## 1.      Exhausation Requirement

First, courts consider whether the defendant has met section 3582(c)(1)(A)'s

exhaustion requirement.  To do so, the defendant must show either (a) that he has "fully

exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on

[his] behalf" or (b) that 30 days have lapsed since "the receipt of such a request by the

warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A).  There is no dispute that

First Step Act."  *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). "[It] is, nonetheless, helpful in defining a vague standard" because "[t]he First Step Act did not revise the substantive criteria for compassionate release."  *Id.*

Bess has not fulfilled either requirement.  He submitted a compassionate release petition to the Butner warden on approximately April 8, 2020, *see* Docket Item 92-1[2]; the BOP denied that petition, Docket Item 92-2 at 1; and Bess has not appealed the BOP's denial, *see* Docket Item 92 at 3[3].  As such, under the explicit terms of the statute, this Court lacks the authority to grant Bess's request until May 8, 2020.  The question thus become whether the exhaustion requirement is subject to any exceptions.

"There are two types of exhaustion requirements: jurisdictional ones and non-jurisdictional ones."  *Ogarro*, 2020 WL 1876300, at *2.  "Jurisdictional exhaustion requirements 'govern a court's adjudicatory authority' and are not subject to any exceptions."  *Id.* (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)).  In contrast, nonjurisdictional exhaustion requirements—sometimes referred to as "claim-processing

---

[2] Bess's counsel originally asserted that Bess submitted his request on March 30, 2020, *see* Docket Item 90 at 9, but he could not provide any evidence supporting that asserted submission date.  During oral argument, Bess's counsel said that when told that his request was dated April 8, 2020, Bess said that must have been the date that it was prepared and submitted.  The government has submitted a copy of Bess's request, dated April 8, 2020, *see* Docket Item 92-1, which it claims was not received until one week later, on April 15, 2020, *see* Docket Item 92-2.  The government offers no reason why Bess would have signed his request on April 8, 2020, but not submitted it that same day.  The Court therefore finds that the request was submitted on April 8, 2020, and applies the analogous prisoner mailbox rule to find that the request was received on the date it was submitted.  *Cf. Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that inmate's notice of appeal "was filed at the time [he] delivered it to the prison authorities for forwarding to the court clerk").  "Unskilled in law, unaided by counsel, and unable to leave the prison, [Bess's] control over the processing of his [request] necessarily cease[d] as soon as he hand[ed] it over to the only public officials to whom he ha[d] access—the prison authorities—and the only information he will likely have is the date he delivered the notice to those prison authorities and the date ultimately stamped on his notice."  *Id.* at 271-72.

[3] During oral argument, Bess's counsel represented that Bess has not yet received a copy of the denial.

rules"—merely "promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times" and therefore are subject to certain exceptions.  *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017) (quoting *Henderson v. Shinseki,* 562 U.S. 428, 435 (2011)); *see also Coleman* v. *Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 203 (2d Cir. 2007) ("[T]he Supreme Court has admonished lower courts to more carefully distinguish between jurisdictional rules and mandatory claims-processing rules, the latter being subject to waiver and forfeiture." (citations omitted)).  Statutory text determines whether an exhaustion requirement is jurisdictional in nature.  "If the [l]egislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) (citation omitted).

Nonjurisdictional exhaustion requirements—that is, claim-processing rules—are subject to certain exceptions, depending on whether they prescribed by the legislature or the courts.  Those created expressly by statute "may be waived or forfeited" by the opposing party, *Hamer*, 138 S. Ct. at 17 (citation omitted), but are not subject to "judicial discretion," *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) (explaining that courts should "not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required."); *cf. Hamer*, 138 S. Ct. at 17-18 & n.3

("We have reserved whether mandatory claim-processing rules may be subject to equitable exceptions." (citing *Kontrick v. Ryan,* 540 U.S. 443, 457 (2004))).  Those created by judges, in contrast, are "amenable to judge-made exceptions."  *Ross*, 136 S. Ct. at 1857.

There is "[a] growing split in this Circuit regarding whether [section] 3582(c)(1)(A)'s statutory exhaustion requirement is [subject to any exceptions]."  *United States v. Gross*, 2020 WL 1862251, at *1, *4 (S.D.N.Y. Apr. 14, 2020) (collecting cases).  Although most courts agree that the requirement is a non-jurisdictional claim-processing rule,[4] there is widespread disagreement about whether any exceptions may apply.  Some courts have found that they independently may excuse a defendant's failure to exhaust, while others have found that only the government may forfeit or waive the requirement.

As an initial matter, this Court agrees that section 3582(c)(1)(A)'s exhaustion requirement is nonjurisdictional.  It "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).  Instead, it "merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made.  That is, it "require[es] that the parties take certain procedural steps at certain specified times."  *See Hamer*, 138 S. Ct. at 17 (2017).  Accordingly, section 3582(c)(1)(A)'s exhaustion

---

[4] *See, e.g.*, *United States v. Haney*, 2020 WL 1821988 at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Russo*, 2020 WL 1862294, at *4 (S.D.N.Y. Apr. 14, 2020); *Gross*, 2020 WL 1862251, at *4; *United States v. Gentille*, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020); *cf. Ogarro*, 2020 WL 1876300, at *3 ("[R]egardless of whether the statute is jurisdictional or a claim-processing rule, its exhaustion requirements are clearly mandatory."); *United States v. Monzon*, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (same).

requirement is a claim-processing rule, subject, at least, to both forfeiture and waiver. *See id.* at 17-18 & n.3.

Before considering whether the requirement also may be subject to judicial excusal, this Court pauses to note that this issue easily could have been avoided. But unfortunately, despite its office having waived the exhaustion requirement in another case in this district, the government has chosen to stand firm in enforcing the requirement in this matter. *Cf. United States v. Haynes*, No. 18-CR-6015-EAW, Docket Item 271 at 1 (W.D.N.Y. Apr. 14, 2020) ("The [g]overnment could have taken the position that [the d]efendant failed to exhaust administrative remedies, but to its credit the [g]overnment has elected to waive that objection because of the unique facts of this particular case."). The Court pressed the government during argument to articulate a reason for this insistence, but counsel was unable to do more than point to the statute.

The lack of persuasive rationale was unsurprising, given that neither of the oft-cited "twin purposes" of administrative exhaustion requirements—"protecting administrative agency authority and promoting judicial efficiency," *McCarthy*, 503 U.S. at 145—is likely to be served by enforcing the exhaustion requirement at this moment with respect to this statute. "[T]he hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of [protecting administrative agency authority], as it allows a defendant to come to court before the agency has rendered a final decision." *United States v. Haney*, 2020 WL 1821988 at *3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, *J.*) (citation omitted). And while the BOP has denied Bess's request, its response is cursory at best, hardly suggesting that waiting for the BOP might allow the

agency to "apply its special expertise" and facilitate "produc[tion of] a useful record for

subsequent judicial consideration."  *See McCarthy*, 503 U.S. at 145.[5]

      The most the government could stand to gain by holding steadfast to the

exhaustion period would be to forestall the inevitable, to say nothing of the lives it would

jeopardize and the resources it would waste in the meantime by litigating the issue and

requiring courts to issue two decisions in many cases.  *See also United States v.*

*Scparta*, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) ("[The risk that COVID-19

presents] is not just to prisoners—it extends to prison guards and staff.  As of April 18,

2020, the [BOP] reports that about 500 inmates and 300 BOP staff have contracted

COVID-19.  And the public is also at risk.  Inmates who are released from prison and

prison staff become additional vectors of transmission, increasing COVID-19's

community spread." (citation omitted)).  This Court therefore urges the government to

reconsider whether enforcing the administrative exhaustion requirement—for the

purpose of delaying a defendant's release by, at most, 30 days—outweighs the

---

     [5] Indeed, even if the BOP acted with exceptional speed in responding to inmates'
requests for compassionate release, it is improbable that an inmate could complete the
exhaustion process before the 30-day period elapses.  *See United States v. Scparta*,
2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) (summarizing BOP regulations, which
provide: "First, an inmate must request the warden of her facility to file a
compassionate-release motion on her behalf.  Second, if the warden denies the
prisoner's request, she has 20 days to appeal to the BOP's Regional Director.  Third, if
the Regional Director denies the prisoner's request, she then has 30 days to appeal to
the BOP General Counsel.  A decision from the General Counsel . . . 'constitutes a final
administrative decision.'" (quoting 28 C.F.R. §§ 542.15(a)) (citing 28 C.F.R. §§
571.61(a), 571.63(a), 542.15(a))); *cf.* Affidavit, *United States v. Nkanga*, No. 18-CR-713
(JMF), Docket # 117-1 (S.D.N.Y.) ("Due to the nature of the review and the volume of
incoming requests, the BOP cannot set forth a firm date by which the BOP will reach a
decision on Petitioner's pending application."); *see also* Letter from Assistant U.S.
Attorney to Judge Liman, dated April 2, 2020, *United States v. Russo*, No. 17-CR-441
(LJL), Docket # 53 (S.D.N.Y.) ("[T]he Bureau of Prisons is unable to give a specific time
frame.").

attendant risks of grave harm, and even death, to defendants and the staff who must care for them during this unprecedented public health crisis.

But while this Court wishes the government would have obviated the need for it to decide the complicated—and the close—question of whether courts independently may excuse a defendant's failure to exhaust, decide it must.  It begins by surveying the different views percolating among the courts of this Circuit.

Courts finding that section 3582(c)(1)(A)'s exhaustion requirement may be excused have taken one of two views.  Some have concluded that a defendant's failure to exhaust may be excused as a matter of judicial discretion if (a) doing so "would be futile," (b) "the administrative process would be incapable of granting adequate relief," or (c) "agency review would subject plaintiffs to undue prejudice," *see, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (quoting *Washington v. Barr*, 925 F.3d 109, 118-19 (2d Cir. 2019)).[6]  Others have found that because "[s]ection

---

[6]  *See also United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement "in light of the urgency of [the defendant's] request, the likelihood that he cannot exhaust his administrative appeals during his remaining 26 days of imprisonment, and the potential for serious health consequences"); *Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (excusing exhaustion requirement "[i]n light of the urgency of [the d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences"); *United States v. Zukerman*, 2020 WL 1659880, at *3-4 (S.D.N.Y. Apr. 3, 2020) (excusing exhaustion requirement, notwithstanding the fact that the defendant's term of imprisonment would not end, at the earliest, until May 2022, in light of the defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at [FCI] Otisville," where at the time of the order, at least one inmate had tested positive for the disease); *United States v. Perez*, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (excusing exhaustion requirement for sentence ending approximately three weeks after the defendant's request to the BOP because "even a few weeks' delay carries the risk of catastrophic health consequences for [the defendant]," such that requiring exhaustion "would result in undue prejudice and . . . [be] both futile and inadequate.); *cf. United States, v. Napout*, 2020 WL 1872455, at *1

3582(c) evinces congressional intent that a defendant has a right to a prompt and meaningful judicial determination of whether she should be compassionately released, regardless of whether administrative remedies have been exhausted," exhaustion may be excused on equitable grounds if "[1] the movant has been pursuing his rights diligently, [2] the BOP has not been able to satisfy its obligation to act expeditiously (including through appeals) or to assure the Court it can do so, and [3] an extraordinary circumstance, not of the movant's own making, stands as a substantial obstacle to him obtaining the meaningful judicial review that Congress intended." *United States v. Russo*, 2020 WL 1862294, at *7 (S.D.N.Y. Apr. 14, 2020) (Liman, *J.*) (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010)).[7]

Those in the other camp find that because "section 3582(c)'s exhaustion proscription is clear as day . . . , it must be 'strictly enforce[d].'" *Ogarro*, 2020 WL

_____

(E.D.N.Y. Apr. 14, 2020) ("[T]he facts of this case—including that, according to the only available data, [the d]efendant is only at slightly higher risk of experiencing more serious consequences from the virus, if contracted, than younger inmates, and the lack of any reported cases of the virus in the federal facility where [the d]efendant is incarcerated—do not support a finding that seeking administrative remedies would be futile in this case.").

[7] *See also Scparta*, 2020 WL 1910481, at *7 (Nathan, *J.*) (distinguishing *Ross* on the grounds that "[u]nlike the [Prison Litigation Reform Act], Congress specifically designed the First Step Act to result in expeditious review of prisoner applications" and excusing the medically-vulnerable defendant's failure to exhaust because "a strict application of the statute's exhaustion requirement . . . could be the difference between life and death"); *Haney*, 2020 WL 1821988 at *3 (Rakoff, *J.*) (finding that "the 30-day rule was intended 'as an accelerant to judicial review,' as 'at the time the First Step Act passed, a 30-day period before which to seek judicial review would have seemed exceptionally quick'" and concluding that "in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus . . . , the objective of meaningful and prompt judicial resolution is clearly best served by permitting [the defendant] to seek relief before the 30-day period has elapsed" (quoting *Russo*, 2020 WL 1862294, *5).

1876300, at *3 (quoting *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004)).[8]

As one such court explained, *Washington* and its doctrine of judicial discretion is

inapplicable, as that case "concerned a judge-made exhaustion requirement to the

Controlled Substances Act, which, though not 'expressly mandate[d]' by the statute's

text, was created as a 'prudential rule of judicial administration' that was 'consistent with

congressional intent'" *Id.* at *4 (alteration in original) (quoting *Washington*, 925 F.3d at

115-16)).   Section 3582(c)(1)(A), in contrast, is prescribed by the legislature and

therefore, these courts conclude, not subject to any judicial exceptions.

   This Court agrees with the former view, as articulated by Judges Liman, Nathan,[9]

and Rakoff.  The Court acknowledges that the text of section 3582(c)(1)(A)

unambiguously mandates exhaustion and that ordinarily when "[f]aced with

unambiguous statutory language requiring exhaustion of administrative remedies, [a

court is] not free to rewrite the statutory text," *see Bastek v. Fed. Crop Ins. Corp.*, 145

---

[8] *See also United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (describing the failure to exhaust as a "glaring roadblock foreclosing compassionate release at this point"); *United States v. Woodson*, 2020 WL 1673253, at *2 (S.D.N.Y. Apr. 6, 2020) ("The plain language of [section 3582(c)(1)(A)] is free from ambiguity."); *Monzon*, 2020 WL 550220, at *2 (same); *Roberts*, 2020 WL 1700032, at *2 (holding that because "[s]ection 3582(c) . . . itself includes a limited futility-like exception, as it allows an inmate to seek relief 'after . . . the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility[,]' . . . the Court is not free to infer a general 'unwritten special circumstances exception.'" (alteration in original) (first quoting 18 U.S.C. § 3582(c)(1)(A)) (second quoting *Ross*, 136 S. Ct. at 1857)).

[9] Judge Nathan first found that because "[section] 3582(c)(1)(A)'s exhaustion requirement is written in mandatory terms, . . . no matter how compelling the circumstances, [courts] lack[ ] [the] power to excuse" a defendant's failure to exhaust. *Gross*, 2020 WL 1862251, at *2 (citations omitted).  But she subsequently was "persuaded by Judge Liman's decision [in *Russo*]" and reached the "contrary conclusion."  *See Scparta*, 2020 WL 1910481, at *2 (citing *Henslee v. Union Planters Nat. Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, *J.*, dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late." ).

F.3d 90, 94 (2d Cir. 1998) (citations omitted).  But the analysis is not so straightforward, as "this [is] an exhaustion requirement like no other of which the Court is aware." *Scparta*, 2020 WL 1910481, at *6 (citations omitted); *see also Russo*, 2020 WL 1862294, at *6 (observing that section 3582(c) "is extremely unusual . . . if not unprecedented").  "[T]he statute does not necessarily require the moving defendant to fully litigate his claim before the agency (*i.e.*, the BOP) before bringing his petition to court.  Rather, it requires the defendant either to exhaust administrative remedies *or simply to wait 30 days* after serving his petition on the warden of his facility before filing a motion in court."  *Haney*, 2020 WL 1821988, at *3 (emphasis added).

Section 3582(c)(1)(A) thus has features both of "an administrative exhaustion requirement" and of "a timeliness statute."  *Scparta*, 2020 WL 1910481, at *6 (citing *Russo*, 2020 WL 1862294, at *6).  And equitable exceptions plainly apply to the latter. *See, e.g.*, *Holland*, 560 U.S. at 645-46 (noting that "a nonjurisdictional federal statute of limitations is normally subject to a 'rebuttable presumption' in *favor* 'of equitable tolling'" (emphasis in original) (quoting *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 95096 (1990))); *see also Young v. United States*, 535 U.S. 43, 49 (2002) ("It is hornbook law that limitations periods are 'customarily subject to equitable tolling.'" (quoting *Irwin*, 498 U.S. at 95)); *see also Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (explaining that "claim-processing rule[s]" are "subject to equitable considerations such as waiver, estoppel or futility").  Although these cases concern "pure" timeliness statutes—not the hybrid exhaustion-timeliness statute at issue here—that distinction is not decisive.  *See Hamer*, 138 S. Ct. at 18 n.3 ("reserv[ing] whether mandatory claim-processing rules may be subject to equitable exceptions" other than waiver and

forfeiture (citation omitted)).  Indeed, were there ever a time to consider whether equity compels excusal of a rule intended merely to "promote the orderly progress of litigation," *Henderson*, 562 U.S. at 435 (citation omitted), it certainly is now when, as explained above, little if anything is to be gained through enforcement but much may be lost.

The question therefore becomes whether applying equitable exceptions to section 3582(c)(1)(A) would be incompatible with Congressional intent.  *See, e.g.*, *Holland*, 560 U.S. at 640 (finding that the federal habeas corpus statute is subject to equitable tolling because "neither [its] textual characteristics nor the statute's basic purposes 'rebut' the basic presumption set forth in *Irwin*").  And on that question, this Court agrees with Judge Rakoff that "Congress cannot have intended the 30-day waiting period . . . to rigidly apply in the highly unusual situation in which the nation finds itself today."  *Haney*, 2020 WL 1821988, at *3.  The statute was "designed to 'enhance public safety' and 'make[ ] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security.'"  *Scparta*, 2020 WL 1910481, at *7 (alteration in original) (quoting H.R. Rep. No. 115-699, at 22 (2018)).  Neither purpose is served by keeping a vulnerable individual incarcerated in precarious conditions that pose risks to not only his own health and safety, but also to the health and safety of the prison staff and the communities to which they return each day.

Having found that section 3582(c)(1)(A)'s exhaustion requirement is subject to equitable exceptions, including judicial excusal, this Court finally considers whether Bess has met the standard for such relief.  The Court applies the standard used in the context of equitably tolling habeas petitions, requiring that a petitioner show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance

stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S.408, 418 (2005)); *see also Menominee Indian Tribe of Wisc. v. United States*, 136 S. Ct. 750, 756 (2016) ("[T]he second prong of the equitable tolling test is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." (emphasis in original)).  Bess meets both factors. First, there is no question that Bess has been pursuing his rights diligently as he sought compassionate release from the BOP despite his facility being under lockdown.  *See* Docket Item 92-1.  Second, and as noted several times throughout this order, the COVID-19 pandemic presents "extraordinary circumstances" that are "beyond [Bess's] control."  Were this Court not to excuse Bess's failure to exhaust, the outcome easily could be fatal.

        In short, this Court has the authority to excuse the defendant's failure to exhaust his administrative remedies.  Accordingly, the Court proceeds to consider the merits of the defendant's motion for compassionate release.

### 2.      Extraordinary and Compelling Reasons

        The second requirement under section 3582(c)(1)(A) is that the defendant demonstrate that "extraordinary and compelling reasons" support his release.  Congress delegated to the United States Sentencing Commission the task of "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction." *See* 28 U.S.C. § 994(t).  The commentary to U.S.S.G. § 1B1.13 includes four examples of such circumstances: "Medical Condition of the Defendant"; "Age of the Defendant";

"Family Circumstances"; and "Other Reasons".  U.S.S.G. § 1B1.13 cmt. n.1.  At issue

here are the first and fourth circumstances.[10]

> The medical-condition circumstance applies when:
>
> (i)  The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease and advanced dementia[; or]
>
> (ii) The defendant is—
> > (I) suffering from a serious physical or medical condition,
> > (II) suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(A).  And the other-reasons circumstance applies when

"there exists in the defendant's case an extraordinary and compelling reason other than,

or in combination with," medical conditions, age, or family circumstances.  *Id.* § 1B1.13

cmt. n.1(D).

---

[10] In its letter rejecting Bess's request for compassionate release, the BOP explained that Bess "[**did**] **not** meet the criteria under **Elder with Medical Conditions**." Docket Item 92-2 at 1 (emphasis in original).  Bess did indicate in his request to the Butner warden that he sought his release under that particular subcategory, *see* Docket Item 92-1 at 1, but he since has amended his request with the assistance of counsel and now seeks his release under the medical-condition or other-reasons subcategories, *see* Docket Item 90.  This Court finds nothing in 18 U.S.C. § 3582(c)(1)(A) or U.S.S.G. § 1B1.13 requiring that the BOP or a court consider a compassionate release request only under the subcategory selected by the defendant on a BOP form.  And this Court will not create such a requirement, given that many defendants submit at least their initial requests without the assistance of counsel, and the BOP form provides little guidance on the criteria for each category.  Indeed, while the Guidelines are clear that the elder-with-medical-conditions subcategory requires that the individual be at least 65 years old, *see* U.S.S.G. § 1B1.13 cmt. n.1(B)—and therefore plainly excludes Bess— the form makes no mention of this basic requirement, *see* Docket Item 92-2 at 1.

Bess, who will turn 65 in August, suffers from a host of serious medical impairments.  *See* Docket Item 90 at 4, 19-20.  He has congestive heart failure, coronary artery disease, severely depressed ventricular function, diabetes, and hypertension.  *Id.* at 19-20.  He has undergone an open-heart triple-bypass surgery as well as multiple surgeries to implant a cardiac defibrillator in his chest.  *Id.* at 20.  And, according to his counsel, Bess has "severely limited heart function."  Docket Item 84 at 2.

This Court already has "take[n] judicial notice that, for people of advanced age, with underlying health problems, or both, COVID-19 causes severe medical conditions and has increased lethality."  *Jones v. Wolf*, 2020 WL 1643857, at *8 (W.D.N.Y. Apr. 2, 2020) (citations omitted).  Those conditions include "serious heart conditions" and "diabetes."  *Id.* (quoting *People who are at higher risk for severe illness*, Ctrs. for Disease Control and Prevention (March 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html).  That finding applies especially to Bess who meets the high-risk profile for multiple reasons.

What is more, the conditions at Butner are exceptionally dangerous.  The BOP reports 50 confirmed inmate and 27 confirmed staff cases of COVID-19, as well as 5 confirmed inmate deaths, at FCI Butner Medium I; it also reports 14 confirmed inmate cases at FCI Butner Low.  *See COVID-19 Cases*, Federal Bureau of Prisons (April 20, 2020), https://www.bop.gov/coronavirus.  Counsel represents that as of April 9, 2020, Bess was being "housed in a 150-man dorm" that is "divided up by a 4-foot high wall

into 3-man cubicles." *See* Docket Item 90 at 6.  Although "the facility had passed out

masks to inmates[,] . . . [other] inmates [were] using them only sporadically" and also

"were inconsistent about washing their hands." *Id.* at 6-7.

This Court previously found that civil immigration detainees "housed within the

general population at [a federal detention facility]" who "[ate] communally, use[d] shared

restrooms, and [were] housed in either shared cells or in dorm-style housing" "face[d] a

heightened risk of contracting COVID-19" in light of government guidance that "such a

communal-living style congregate setting increases the infection rate." *See Jones*, 2020

WL 1643857, at *8.  This Court is far from alone in reaching that conclusion.

> The COVID-19 pandemic is extraordinary and unprecedented in modern
> times in this nation.  It presents a clear and present danger to free society
> for reasons that need no elaboration. COVID-19 presents a heightened risk
> for incarcerated defendants like [the defendant] with respiratory ailments
> such as asthma. . . .  Further, the crowded nature of municipal jails such as
> the facility in which [the defendant] is housed present an outsize risk that
> the COVID-19 contagion, once it gains entry, will spread.  And, realistically,
> a high-risk inmate who contracts the virus while in prison will face
> challenges in caring for himself.

*United States* v. *Hernandez*, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (collecting

cases).

In short, the grave risks that COVID-19 poses to individuals with the defendant's

medical conditions, combined with the increased risk inmates face of contracting the

disease at Butner, constitute "extraordinary and compelling reasons for sentence

reduction." *See* 18 U.S.C. § 3582(c)(1)(A).

### 3.    Dangerousness

Third, courts consider whether the defendant is "a danger to the safety of any

other person or to the community."  U.S.S.G. § 1B1.13(2).

Bess's counsel represents that while in custody, Bess "has completed one drug program and had nearly completed a second" before its cancellation due to COVID-19; has "completed courses on commercial truck driving and financial management"; and "has had no write-ups or disciplinary issues."  Docket Item 90 at 7-8.  During argument, counsel also stated that Bess was slated to begin the Residential Drug Abuse Program at FCI Lexington but that his transfer was cancelled due to the virus.  The government does not dispute any of these assertions but argues that release is inappropriate because the BOP has determined that Bess poses a "'medium risk' rather than a 'low risk' of recidivism."  Docket Item 92 at 3.  The government further explains that "[a]lthough the BOP [does] not have available its grounds for having classified Mr. Bess as 'medium risk' for recidivism, one need only review his criminal history summarized in the Pre-Sentence Investigation Report ¶¶ 33-63 (13 criminal convictions since age 19 including felony convictions for numerous burglaries and controlled substance offenses)."  *Id.* at 3 n.3.

This Court agrees with Bess that he does not pose a risk of danger to his community.  As this Court explained when sentencing Bess substantially below the Guidelines range, his age and serious medical conditions make it unlikely that he will pose a threat to his community.  *See* Docket Item 87.  What is more, although Bess has an extensive criminal history, it is comprised of relatively small burglary and theft-related offenses resulting largely from untreated substance abuse.  *Id.* at 4.  The government lumps these offenses together, acknowledging neither the significant passage of time since, nor the mitigating facts underlying, many of the convictions.  *See* Docket Item 84 at 7-12 (1975 burglary conviction for stealing $70 in cash, checks, and credit cards;

1976 burglary conviction for stealing $72 from victim's purse; 1979 receipt-of-stolen-

property conviction, details unavailable; 1988 petty-theft conviction for stealing portable

telephone from K-Mart; 1991 petty-theft conviction for stealing $487.87 worth of food

from a grocery store; 1995 petty-theft conviction for stealing victims' wallets; 1998

attempted-burglary conviction, details unavailable; 2001 grand-theft conviction for

stealing televisions sets from a hotel; 2002 controlled-substance conviction for

possessing marijuana and methamphetamine; 2003 burglary conviction for stealing a

$299 vacuum cleaner; 2005 petty-theft conviction for stealing a $349.99 DVD player;

2011 burglary conviction for passing a false check; 2011 burglary conviction for theft of

another's unspecified personal property).

  In short, Bess does not pose a danger to the safety of his community such that

he should continue to be confined in the face of the substantial risk to his health and

safety.

###    4.  Section 3553(a) Factors

  Finally, courts "consider[ ] the factors set forth in section 3553(a)." 18 U.S.C. §

3582(c)(1)(A). Those factors include:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the
>   law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational
>   training, medical care, or other correctional treatment in the most effective
>   manner;
>
>  . . .

(4) the kinds of sentence and the sentencing range established [under the applicable Guidelines sections]

. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

"[I]n deciding motions for compassionate release, the Court should be wary of using the motion to 'correct' the sentencing court's original judgment or introduce unprincipled variance into the execution of duly-imposed sentences, while still honoring Congress's stated intent of increasing the availability of compassionate release." *Ebbers*, 2020 WL 91399, at *7.  For that reason, "in considering the section 3553(a) factors, it should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence."  *Id.*

Here, in sentencing the defendant less than one year ago, this Court determined that the applicable Guidelines range was a sentence of imprisonment of 188 to 235 months, a fine of $30,000 to $5,00,000, and a period of supervised release of 4 to 5 years.  *See* Docket Item 87.  Citing the defendant's age, serious medical conditions, history of substance abuse, and nonviolent criminal history, the Court varied downward substantially, imposing a term of imprisonment of 84 months.  *Id.* at 4.  It specifically noted that "a guidelines sentence would essentially be a life sentence due to the defendant's age and health issues."  *Id.*

This Court is now even more convinced that unless it lowers Bess's sentence, there is a substantial risk that he will become seriously ill and, with an unsettlingly high

degree of probability, serve a life sentence.  That concern, combined with the fact that,
as discussed above, he does not pose an ongoing danger to his community, strongly
counsels early release.  That conclusion is further supported by the fact the Court
releases Bess not on his own recognizance, as it were, but instead to home
incarceration.  In other words, Bess still is required to serve the remainder of his
sentence, albeit in a different setting that is more likely to protect his health and safety.

　　　　This Court therefore is not using the statute to "correct" its original judgment.
*See Ebbers*, 2020 WL 91399, at *7.  Indeed, the Court has no reason to believe that its
original judgment needs correcting.  But the COVID-19 crisis has changed everything
for all of us, and especially for Bess.  If this Court is to make good on its desire at
sentencing not to impose a life sentence, compassionate release is necessary.  And if
compassionate release is not warranted for someone with multiple factors placing his
life at risk during an unprecedented pandemic—especially someone housed in a facility
already riddled with the contagion—then when is it warranted?

　　　　The Court acknowledges that Bess has served only about 41 months of his
sentence.  He thus is being released prior to the completion of his statutorily-mandated
term of 60 months.  But this Court finds no indication in the text of section 3582(c)(1)(A)
that courts are limited to offering compassionate release only to those inmates who
have satisfied their statutory-minimum terms of incarceration.  Instead, the statue
broadly authorizes courts to "reduce the term of imprisonment," adding only that the
court also "may impose a term of probation or supervised release with or without
conditions that does not exceed the unserved portion of the original term of
imprisonment."  18 U.S.C. § 3582(c)(1)(A).  And other courts have ordered release prior

to completion of statutory minimums.[11]  The statutory minimum therefore does not limit

this Court's discretion in ordering Bess's early release.

      In light of the defendant's age, his serious health issues, the fact that his

reoffending is unlikely, and the fact that he will remain under supervision for five years

after his release,[12] this Court finds that release is appropriate.  The Court also exercises

its discretion under section 3582(c)(1)(A) to "impose a term of probation or supervised

release with . . . conditions that does not exceed the unserved portion of the original

term of imprisonment" and notes that doing so further reduces the risk of danger posed

by Bess, as well as any risk that reducing his sentence might result in "unwarranted"

---

[11] *See, e.g.*, *United States v. Yahoshua Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125, at *7 (D. Haw. Apr. 13, 2020) (granting the defendant's section 3582(c)(1)(A)(i) motion, notwithstanding significant time remaining on his sixty-month term of imprisonment, equal to the statutory minimum, and "plac[ing] [him] on home confinement without electronic monitoring for a period of home confinement equal to the remaining term of his original sentence of incarceration"); *United States v. Rodriguez*, 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (granting the section 3582(c)(1)(A)(i) motion of a defendant who had "served the vast majority of his mandatory minimum sentence"—seventeen of twenty years—"and [was] a year and a half away from release" and reducing sentence to time served); *United States v. Schmitt*, 2020 WL 96904, at *6 (N.D. Iowa Jan. 8, 2020) (granting the section 3582(c)(1)(A)(i) motion of a defendant who had served 77 months of her 120-month sentence, which equaled the statutory minimum, and reducing sentence to time served).

[12] During oral argument, the government requested that if this Court orders Bess's release, it also consider extending Bess's term of supervised release to seven years, effectively ending his supervision at the same time that it would have ended had he served his full term of incarceration.  Having considered that option, the Court finds that such an extension is not warranted.  As it stands, Bess will be a few months shy of 70 years old when his supervision ends.  He is unlikely to reoffend at that age.  What is more, by that point Bess will have been closely monitored for five years, including an extensive period of electronic monitoring.  If he is going to recidivate, he likely will have done so long before five years is up.  In other words, this Court finds two more years of supervised release to be of little value under the circumstances.

sentencing disparities.  More specifically, Bess will be subject to home incarceration and placed on electronic monitoring until his anticipated release date, October 20, 2022.

## ORDER

In light of the above, IT IS HEREBY

ORDERED that the defendant's emergency motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), Docket Item 90, is **GRANTED**; and it is further

ORDERED that the defendant's sentence is reduced to **time served** and the **BOP shall immediately release the defendant**; and it is further

ORDERED that the defendant's term of supervised release shall commence immediately upon his release from incarceration, subject to the terms and conditions set forth in the judgment, Docket Item 86, except that, **beginning 14 days after his release and through October 20, 2022**, the defendant shall comply with the conditions of the Location Monitoring Program (**home incarceration** component); he shall wear an electronic monitor, follow the monitoring procedures outlined in Probation Form 61, and contribute to the cost of services rendered (co-payment); and it is further

ORDERED that the defendant shall contact the United States Probation Office, Western District of New York, at 716-362-5226, within 24 hours of his release; and it is further

ORDERED that, following his release, the defendant must travel directly to 514 E. Fifth St., Jamestown, NY, 14701, and may not make additional stops on his return home; and it is further

ORDERED that, upon returning to his residence, the defendant must self-quarantine for 14 days.

SO ORDERED.

Dated:   April 22, 2020

Buffalo, New York

*/s/ Hon. Lawrence J. Vilardo*
_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE